## ECLIPSE INTERCHANGEABLE COUNTERBORE CO. v. GAIRING TOOL CO.

District Court, E. D. Michigan, S. D.   April 18, 1929.

No. 2449.

Stuart C. Barnes, of Detroit, Mich., for plaintiff.

Francis D. Hardesty, of Detroit, Mich., for defendant.

TUTTLE, District Judge.  This suit involves reissue patent No. 16,817 issued December 13, 1927, on an application of J. H. Smith; the original application was filed September 20, 1920.  No question is here raised as to the propriety of the reissue, and it is therefore held that the reissue is a valid one if the claims state subject-matter patentable over the prior art.  No question of infringement is involved, and the case turns solely on the validity of the claims of the reissue patent.

The patented claims are drawn to a boring tool having a head and cutters of more than one diameter with cutting ribs of the smaller diameter running substantially the entire length of the head and cutting ribs of larger diameter starting at a point somewhat removed from the working end of the head and running substantially the rest of the length of the head in overlapped relation with the cutters of smaller diameter.  The testimony shows that Mr. Smith designed the patented tool as an improvement over the old stepped counterbore; that is, a tool in which the several diameters were all located on the same cutting rib.  This old stepped counterbore is capable of enlarging an already present hole to two or more diameters, or enlarging the hole ·and performing facing operations. However, when the old tool is ground back in sharpening, ordinarily the life of the tool will be no greater than the shortest distance between two diameters.  The reason for this is that in grinding back the portions of ribs of larger diameter, the grinding nicks into what becomes the rib parts of smaller diameter.

Smith made a very decided improvement over this stepped counterbore.  The tool, instead of being so limited in its life, can be ground back to substantially the full length of the shortest cutting rib.  This rib may be made of considerable length, and consequently the life of the tool is very much greater, for each diameter has an entirely independent rib.  Furthermore, the ribs can be sharpened with less difficulty because they are independent.  Again, other advantages flow from the independence of the ribs, especially in conducting away heat generated in the cutting operations.  This independence for each cutting rib of different diameter has also made possible quite a high development in this tool in the way of multiple cutting operations by a single cutter.  It has made it possible to perform a number of simultaneous facing, boring, and chamfering operations, all with one tool, and in which the working edges of the separate ribs are closely grouped when considering their relative location along the length of the tool.  This would not be commercially practical in the old stepped counterbore, for the reason that the life of the tool would be so short, due to the close grouping of these cutting edges on one blade, that its use would result in a very high tool expense.

Approaching the issues here involved from this angle of the case as presented by the plaintiff's proofs, the patented invention indicates decided genius and decided worth. I find a decided improvement also over the multiple diameter tool with removable blades. ▮ The defense centers chiefly around a prior use of a tool by the Ohio Brass Company, at Mansfield, Ohio, and the Thomas patent, No. 805,170.  This prior use at Mansfield, according to the accepted doctrine, must be proved beyond a reasonable doubt.  Fur

thermore, the proofs must satisfy the court that this tool was used by the Ohio Brass Company with some degree of success.

The court has read the depositions taken at Mansfield, and has also listened to what counsel have had to say about these depositions, letting them point out any portions on which they rely. There has been testimony here in open court of one witness who testified that he was with the Ohio Brass Company at Mansfield during the period involved, and that many years before the patent in suit the drawings here in evidence were made, and that one tool that I have seen was made, and that the tools were used.

Now I have no doubt whatever about the genuineness of these drawings. I have given careful consideration to the attack made on them, but I am convinced that the drawings are genuine and that there is not fraud or perjury in connection therewith. I find there is record proof here of the drawings and the time they were made, tracing it back from the inventory sheet made in 1920, listing the tool by number. This identifies it with the drawings and it is listed as a tool made in 1913. Using the best judgment I have in the way of testing what is safe to rely upon and what is not safe, recognizing fully that I ought not to use this at all unless I am satisfied beyond a reasonable doubt that it is genuine, I have no reasonable doubt at all, and I must say, in performing my duty, that I have no reason to doubt but what they made the drawings back in 1913—or about that time, the exact date is not important, because it is so many years before the patent in suit that we are not confronted with any nicety of hours, or days, or weeks, or months, but a period of years intervening. One of those old tools made from that drawing is here in court as an exhibit, to wit, Exhibit 1.

Of course, it is possible for anybody to be mistaken, but as to the fact that those drawings were made at the time alleged, and the tools were made and used, and that this is one of them, seems to me about as near positive as anything can be in the way of proof about events that happened long ago.

The degree of success of this Mansfield tool is not so plain. I am satisfied that the tool made at Mansfield was not anywhere near as sucessful as the present tool of the plaintiff, but I do not understand that that is the test, measuring its success by the present success and present usefulness. I am satisfied that they made it and that they used it. It was an operative tool, and I think therefore it comes into this lawsuit and must be dealt with as part of the prior art.

This is one of those cases where the patentee knew nothing about the prior use, and the court can hardly help feeling sorry that there actually was this prior use. It did not help the applicant at all. What was done at Mansfield was not published, was not patented, and the amount that it helped the world, of course, was pretty limited. But so long as I find, as I do, beyond a reasonable doubt, that it was done, that it was used, and with mechanical success sufficient to bring it into the art, I am forced to consider it. I say almost reluctantly that I reach this conclusion, but that is part of the patent game. Every man who makes an invention undoubtedly retravels roads that have been traveled by somebody else; he has never seen the scenery, and it is new to him. He does just as much work as if the other man had not blazed the trail at all. This is one of the injustices of the law that cannot be cured, and necessarily so, and any attempt to cure it would be attended with greater misfortunes than the one I have pointed out.

The Thomas patent in a way belongs to the same category, but of course the patentee might have found the Thomas patent upon a search. The Mansfield tool clearly recognized the advantage of getting away from the stepped tool. It recognized the desirability and advantage of having cutting blades entirely separate and distinct, so that they could be ground. It carried with it also the advantage of saving the tool from overheating, which I think is considerable, for this tool had a greater body of metal to carry away the heat than the edge that was doing the cutting. It had the added advantage of the two cutting blades being separate ribs, separated by valleys so that the heat from one was not so readily transmitted to the other. In fact, so much of the patent in suit is present in the Mansfield prior use that each and all of the claims of the patent in suit, except claims 4 and 6, read easily and readily and completely, I believe, on the Mansfield prior use. About the only thing that plaintiff contends that is not present is the head. The Mansfield tool does not show quite so big and pronounced a head as that shown in the patent in suit, but I take it that this comes from the fact that in the Mansfield tool there were only two cutting ribs for the smallest diameter. If the Mansfield tool had provided more cutting knives or edges for the smallest diameter, it would of necessity increase the diameter of the head portion. That is the natural result of increasing the number of knives in the smaller diameter. The number of knives in the larger diameter does not so much de-

termine the size of the head as the number of knives in the smaller diameter.

The Thomas patent has to do with what was evidently thought to be a drill, for drilling an original hole and not for cleaning out or increasing the size of an already prepared hole, although it might be used for that purpose. But it is a tool of a little different type, particularly in that respect, and the cutting edges of smaller diameter and larger diameter are not so distinctly separated. If it were not for the Mansfield prior use, it might not perhaps be so necessary to declare the several claims void, but the Mansfield prior use alone makes it necessary to declare claims 1, 2, 3, 5, 7, 8, and 9 void. Of course, the Thomas patent contributes to that same conclusion. I have no difficulty in reaching this conclusion.

The more difficult problem for the court is what to do with claims 4 and 6. These claims call for the cutting ribs of smaller diameter, to number at least three, to pilot the cutting ribs of larger radii. These two claims will not read on any patent or any structure in the record. This is a combination which has never prior to this suit been brought into one tool. Every one of these elements, however, is found in some old tool, some old structure. Here is a combination which has been successful, which has produced a good and helpful tool, a worthwhile thing in an important art, and as the court sees it, it needs all of these elements to make this good tool. Take away any one of the elements and one does not have this desirable tool. I believe that the bringing of all those elements into this one tool was a decided step in advance.

The inventor, of course, did not pursue the line of advance that I am forced to pursue in testing his improvement for invention. I cannot measure it from his angle. If I could, it would be easier, and the advance greater. But I think that, measured from the angle which the court is obliged to take, considering all these exhibits that are now in evidence, and having in mind the prior art, the bringing of these elements together to form the patented tool, which found a ready market, ought to be rewarded by a patent. The public is free to make this tool without any one of the elements claimed in combination in claims 4 and 6. The tool defined by these claims performs in one operation a multiplicity of kinds of work that was formerly done in separate operations. There is a real field for a tool of this kind.

The Mansfield tool did not have the three cutting ribs of smallest diameter, as defined in claims 4 and 6. This serves the useful purpose of piloting the cutters of larger diameter in subsequent operations. The stepped counterbore of the prior art had more than two cutting blades in the smallest diameter and performed this piloting service —and that makes this problem difficult to support these claims and hold them valid. But we have here a tool that has longer life, and in view of the success of the patented tool, I believe that the court is warranted in sustaining these claims. I am measuring this question of invention as required by the law, by an artificial step, which of course the inventor did not take. From his information and from his standpoint, he took a much larger step than the one indicated after all the prior art has been gathered together in this lawsuit. If one takes the Mansfield prior use, this exhibited the features of separate blades and the longer life of the tool, but it had poor guiding qualities due to the use of only two knives in the smaller diameter. It makes little difference whether one considers Smith's improvement to consist of putting a large number of cutting knives in the small diameter of the Mansfield tool, or whether you consider that he took the old stepped tool and put into it the knives arranged in different planes for the different diameters as shown by the Mansfield tool. I believe that under the circumstances of this case—in a way, a peculiar case—I am justified in giving enough credit for that thought, and that combination, to hold it to be a patentable invention. It is a new combination. True, I am unable to say that each element performs a different function in the new combination than it did in the old; the three blades or more of smaller diameter piloted the old stepped tool in the way that they do in the patented tool. The separate ribs for each diameter extend the life in the patented tool as they did in the Mansfield prior use, and so they function the same way. But the new combination makes the tool a worthwhile tool, and it is such a decided advance in the art that, having found all these things in one tool, any person who was bent on performing the work that is performed by the patented tool would hesitate to do without any one of the elements of this combination. This is a tool that I think ought to have patent protection. The patent is presumed to be valid, and the success that this record shows the tool has had merits the upholding of the patent if possible. There is also to be considered the obscurity of the Mansfield prior use. Whatever took place was practically lost to the world. While I believe the tools were

made at Mansfield and used there, and that they can be made again and used, nevertheless it fell short of the success of this tool. I mention these things in justification of going far to hold claims 4 and 6 to involve patentable invention over the prior art. These same facts and equities cannot save the claims that read directly on the prior use.

In view of the above, I hold claims 4 and 6 of the patent valid and infringed. The remaining claims of the reissue patent I hold void as anticipated. The plaintiff may have a decree accordingly, with costs to be taxed for the plaintiff, and a reference to William S. Sayres, standing master of this court, to compute the damages and profits, and also make a report upon what will be a reasonable royalty.